NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0731n.06
Filed: October 11, 2007

Case No. 05-4409

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

TONE DELJOSEVIC,                          )
                                          )
    Petitioner,                           )
                                          )
                                          )     **ON APPEAL FROM THE**
    v.                                    )     **BOARD OF IMMIGRATION**
                                          )     **APPEALS**
ALBERTO R. GONZALES, United States        )
Attorney General,                         )
                                          )
    Respondent.                           )
                                          )

**BEFORE: MARTIN and BATCHELDER, Circuit Judges, and O'MEARA,[*] District Judge.**

    **ALICE M. BATCHELDER, Circuit Judge.** Mr. Prelja Deljosevic, a teacher and political

activist, came to the United States with his family in 1986, fleeing persecution in Yugoslavia. He

is now 65 years old and his family includes his wife, Tone Deljosevic (age 52), and his five children:

daughters Vesna (36), Elizabeth (34), and Susana (32), and sons Nino (29) and Albert (27). In April

1990, Mr. Deljosevic filed an I-589 form with the INS, requesting asylum for himself and his family.

Meanwhile, he taught school and continued his work promoting Albanian Human Rights. On March

2, 2001, Mr. Deljosevic and his three youngest children[1] were granted Legal Permanent Resident

status. Due to an administrative miscue, however, Mrs. Deljosevic has traveled a different path.

---

[*]The Honorable John Corbett O'Meara, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1]By 2001, the two older children, Vesna and Elizabeth, were adults and no longer eligible for consideration as part of the family unit under Mr. Deljosevic's I-589 application. Vesna obtained LPR status by filing her own I-881 form requesting special rule cancellation of removal and Elizabeth adjusted her status after marrying a U.S. Citizen.

In late 1994, Mrs. Deljosevic (hereinafter "Petitioner") was — with the rest of her family — awaiting a decision on her husband's I-589 application for asylum. She obtained an "advance parole" from the INS, pursuant to 8 C.F.R. § 212.5(f), and traveled to Yugoslavia for 15 days to visit her dying father, returning on January 4, 1995, apparently without incident. But, on January 11, 1996, the INS issued an Order to Show Cause, charging her with deportability under former 8 U.S.C. § 1251(a)(1)(C)(i) (repealed 1996), on the theory that she had left the country improperly. Petitioner tendered her "advance parole" and on August 22, 2000, the INS, admitting its mistake, moved the immigration court to terminate the deportation proceedings. The court granted the motion on September 11, 2000, but the immigration judge (Elizabeth A. Hacker) failed to return Petitioner to her prior status, i.e., awaiting a decision on Mr. Deljosevic's I-589. Instead, she remained in immigration limbo, unaware that she was no longer being considered for Mr. Deljosevic's I-589, and because the INS now viewed her as in the United States illegally, she was without protection against removal.

On December 14, 2000, the INS issued Petitioner a Notice to Appear, charging her with being an alien without a valid entry document, removable under 8 U.S.C. § 1182(a)(7)(A)(i)(I). On January 11, 2001, Petitioner, represented by attorney Fakhri W. Yono, appeared once more before Immigration Judge Hacker. The record of that proceeding reveals that, in the span of about one minute, Petitioner admitted the factual allegations and conceded that she was subject to removal; Attorney Yono advised that Petitioner would apply for cancellation of removal based on her husband's pending LPR application, but Judge Hacker replied that she was ineligible; Attorney Yono then offered that Petitioner would file for asylum, but again, Judge Hacker replied that she was ineligible; Attorney Yono asked to reset the hearing for another date so that he could consider the

2

possibilities, but Judge Hacker denied his request; finally, Judge Hacker offered that Petitioner could apply for withholding of removal and Attorney Yono consented. Judge Hacker ordered the application be submitted by February 7, 2001, and Petitioner met that deadline.

Three aspects of this exchange warrant further discussion. First, although Judge Hacker had deemed Petitioner ineligible to apply for *cancellation* of removal because she lacked the requisite qualifying relative, Petitioner became eligible when her husband and children acquired LPR status on March 2, 2001. Therefore, on October 19, 2001, Petitioner moved to reconsider her application for cancellation of removal, and on November 13, 2001, Judge Hacker granted the motion.

Second, Petitioner was only faced with these options because of the INS's mistaken Order to Show Cause and Judge Hacker's subsequent failure to return her to her family unit. But for these errors, there was no basis for the Notice to Appear, Petitioner would have had no occasion to concede removability, and moreover, Petitioner would have obtained LPR status with the rest of her family on March 2, 2001. As it stood, however, she was forced to pursue these options.

Finally, had Petitioner not been relegated to immigration limbo, unaware that she was no longer being considered for Mr. Deljosevic's I-589 application, she could have acted to protect against removal. Foremost among her possibilities, Petitioner could have filed for "special rule" suspension of deportation or cancellation of removal, as her daughter Vesna had done, pursuant to Nicaraguan Adjustment and Central American Relief Act (NACARA), Pub. L. No. 105-100, 111 Stat. 2160 (1997)). Under NACARA, certain suspension-of-deportation or cancellation-of-removal provisions were made specially available to a limited class of aliens, including:

> An alien who entered the United States on or before December 31, 1990, filed an application for asylum on or before December 31, 1991, and, at the time of filing the application, was a national of . . . Yugoslavia, or any state of the former Yugoslavia;

3

> An alien who is the spouse or child of an individual described [above] at the time a decision is made to suspend the deportation, or cancel the removal, of the individual described [above.]

8 C.F.R. § 1240.61(a)(3) & (4). It is undisputed that Petitioner is from Yugoslavia, that she entered the United States in 1986, and that she is the spouse of Prelja Deljosevic, who had filed an I-589 application for asylum. It is the date of December 31, 1991, that is critical to the ensuing analysis.

The next hearing occurred on January 5, 2004. Petitioner again appeared before Judge Hacker, this time represented by attorney James Hoare, for an evidentiary hearing on her motions for cancellation of removal and withholding of removal. To put it mildly, the proceeding did not go well for Petitioner. At the outset, certain documents were excluded for untimeliness and Attorney Hoare could offer no explanation other than, "we prepared them late." As the hearing proceeded, it became evident that Attorney Hoare was woefully unfamiliar with his own file, Petitioner's situation, or even the objective of the hearing. Judge Hacker admonished him repeatedly to ask questions in the first person, rather than directing his questions to the interpreter, which — along with the often confusing and redundant questioning — appeared to mislead Petitioner and her supporting witnesses into needlessly (and incorrectly) contradicting themselves and each other.

On cross-examination, the DHS focused on Petitioner's failure to submit certain supporting documentation (e.g., deed or mortgage to her home, proof of employment, membership in her church, passport, etc.). At each inquiry, Petitioner explained that she had provided the information to her attorney and she had no explanation for why he had not submitted it to the court. Judge Hacker — who referred to this absence of documentation several times in her subsequent decision — intervened in this questioning, and in doing so, questioned Petitioner rather ruthlessly:

4

| [Judge Hacker]: | The question was, you have not submitted your deed to this court. Why not? |
|---|---|
| [Petitioner]: | I don't know what is that, I just submitted my documents to my attorney. |
| [Judge Hacker]: | Ma'am, do you remember that approximately an hour and 15 minutes ago, I asked you if you knew the contents of your applications for relief, including all of the attachments and supplements? |
| [Petitioner]: | Yes, I was sure that it was there, that's why I said yes. |
| [Judge Hacker]: | We'll ma'am, I asked you if you knew them, I asked you if you reviewed them and you said that you did. You swore under oath that you did. Now, that document is not among materials submitted. Now, you testified now that you gave it to your lawyer, who, but none of these documents have been submitted. So my question to you, ma'am, is were you lying when you said under oath that you reviewed these documents with your attorney and you knew what was in them? |
| [Petitioner]: | I took [the oath] because I believe as much as I know that every document is submitted there and it's true. |
| [Judge Hacker]: | Well, okay, and so you knew that those documents weren't part of the application, so why are they not part of your application? |
| [Petitioner]: | I - - two days ago I talked with an attorney and I asked him if everything is all right, is any documents submitted? Is everything - - and I [was assured] that everything is okay, every document submitted. |
| [Judge Hacker]: | That's not responsive to my question, ma'am. |
| [Petitioner]: | What can I do? I submitted all that I was asked to submit. |
| [Judge Hacker]: | Well, ma'am, they're not part of the application, so I'm asking you why they aren't. |
| [Petitioner]: | I don't know, I don't know. |

Judge Hacker continued this line of interrogation, asking specifically about certain documents, why they had not been submitted, and why certain witnesses were not present to testify. Notably absent from this prolonged exchange was any interjection, assistance, or explanation by Attorney Hoare.

5

After Petitioner was dismissed from the witness stand, Attorney Hoare called Petitioner's husband, Prelja, and her youngest son, Albert. These witnesses — under Attorney Hoare's questioning — did little to assist Petitioner's case, as they (inexplicably) appeared disinterested in her circumstances and gave testimony that appeared to contradict and confuse her prior answers.

The DHS argued in closing that Petitioner had not shown the exceptional and extremely unusual hardship necessary to invoke cancellation of removal, and emphasized the lack of supporting documentation. Despite this emphasis on her lack of documentation, however, the INS conceded, in a critical stipulation, that Mr. Deljosevic *had filed* his I-589 request for asylum *in 1990*:

| | |
|---|---|
| [Judge Hacker]: | Query to Government, what is the Government's position with respect to her application vis-a-vi[s] (indiscernible)? You acknowledge that the husband filed in 1990. Correct? |
| [INS]: | Yes. |
| [Judge Hacker]: | Is the Government arguing that she is not eligible under NACARA? |
| [INS]: | No, I'm not arguing that, Your Honor. |
| [Judge Hacker]: | You are not? |
| [INS]: | No, I believe what she's applied for is cancellation under the statute, I don't believe she's applied for - - |
| [Judge Hacker]: | Well, there's no NACARA application pending?[2] |
| [INS]: | Right. Even if there was one, though, based on the evidence of record, I still don't believe that she has met her extreme hardship requirement. . . . |
| [Judge Hacker]: | If she's applying under the statute, what's the Government's position vis-a-vi[s] the ten years? |

---

[2]This assertion that Petitioner had no application pending was correct, but was entirely the result of errors by the INS and Judge Hacker, namely, the INS's January 1996 overlooking of her "advance parole" and Judge Hacker's September 2000 error in not returning her to the family unit awaiting a determination under Mr. Deljosevic's I-589 application (i.e., in relegating her to immigration limbo). As this application had been approved in March 2001, it was true that there was no application pending, but it should already have been decided in Petitioner's favor.

6

| [INS]: | Well . . . I believe that she's been here at least . . . the last ten years from today's date, but I don't concede that she's been here since [19]84. |
| --- | --- |
| [Judge Hacker]: | All right, so . . . is the Government then conceding that she has ten years immediately prior? |
| [INS]: | Yes, Your Honor. |

If Attorney Hoare was present during any of this, he made no sound on the record. Judge Hacker took a recess and when she returned, she rendered an oral opinion denying Petitioner's motions.

Judge Hacker identified the elements for cancellation of removal: (1) presence in the United States for 10 years; (2) good moral character during that time; (3) no criminal conviction for certain, specified offenses; and (4) removal would result in "exceptional and extremely unusual hardship" to a qualifying LPR family member, in this case Mr. Deljosevic. *See* 8 U.S.C. § 1229b(b)(1). Judge Hacker conceded that Petitioner had satisfied the first three elements, but denied the fourth, partially due to the absence of even minimal supporting documentation and the apparent inconsistencies of the witnesses' testimony, and partially due to the strictness of the particular statutory standard:

> While counsel has argued hardship to the [Petitioner], should she be separated from her husband, children[,] and grandchildren, this is not a factor that the Court can weigh in the [Petitioner]'s application, since the sole hardship is a matter of statute, which may be considered in this case [only] to the qualifying family members.

Notably, Judge Hacker did *not* make any adverse-credibility finding, and in fact, despite acknowledging her "questions concerning the credibility in this case of all the witnesses," she expressly accepted Petitioner's testimony, although she found that it did not prove "exceptional and extremely unusual hardship." Judge Hacker ordered Petitioner removed to Yugoslavia, and informed her that she had until February 4, 2004, to file a direct appeal with the BIA.

7

Petitioner — still represented by Attorney Hoare — appealed to the BIA on January 25, 2004, arguing that Judge Hacker erred by failing to revisit and consider Petitioner's previously filed application for suspension of deportation, pursuant to 8 C.F.R. § 1240.58 (authorized under NACARA). Furthermore, because she would have satisfied the less stringent suspension-of-deportation standard, Petitioner established prejudice from this error. The BIA affirmed the immigration court, explaining that "[t]he record supports the Immigration Judge's determination that [Petitioner] failed to demonstrate that a qualifying relative would suffer 'exceptional and extremely unusual hardship' as is required to support a grant of cancellation of removal." In response to Petitioner's contention that she was eligible for "special rule" suspension of deportation under 8 C.F.R. § 1240, Subpart H, the BIA asserted that "she has failed to establish that she is eligible" because "[t]here is no evidence that [Petitioner] filed an asylum application on or before December 31, 1991." The BIA dismissed her appeal, and Petitioner did not appeal that decision to this court.

Instead, on July 1, 2005, Petitioner — represented by new counsel, Attorney Carl Weideman — filed a "Motion to Reopen" with the BIA, explaining that Petitioner (as a derivative applicant on her husband's application) *had filed* for asylum in April 1990 and, contrary to the BIA's finding, was eligible for "special rule" suspension of deportation under 8 C.F.R. § 1240.61(a)(3) & (4). Petitioner further explained that her former counsel (Attorney Hoare) had possessed sufficient documentation to establish her eligibility, but failed to submit it; and DHS counsel had the same documentation, but failed its apparent duty to disclose it. Finally, Petitioner justified her motion with a claim of ineffective assistance of counsel and satisfied the procedural requirements of *In re Lozada*, 19 I. & N. 637 (BIA 1988), *affirmed* 857 F.2d 10 (1st Cir. 1988) (in immigration proceedings, an ineffective

8

assistance of counsel claim must be prefaced with a specific client affidavit, notice to the attorney, and the filing of a disciplinary complaint).  Petitioner appended supporting documentation.

On October 5, 2005, the BIA denied the motion, stating that Petitioner had failed to submit evidence that her asylum application was filed by the required date.  The BIA explained:

> In her motion [to reopen], [Petitioner] asserts, as on appeal, that she is eligible for suspension of deportation under the special rules stated in 8 C.F.R. § 1240.61(a)(3). With this motion she has submitted a copy [of] an asylum application, dated April 10, 1990, from her husband and listing [Petitioner] as a derivative beneficiary.  The rules in 8 C.F.R. § 1240.61(a)(3) require evidence that such application be filed on or before December 31, 1991.  The respondent has not submitted evidence that such application was filed by that date.  [Footnote:]  The record reflects that an asylum application was filed at some point as [Petitioner] was granted advance parole as an asylum applicant or derivative asylum applicant.

The BIA also held that, although Petitioner met the procedural requirements of *In re Lozada*, she had failed to show "that she was even prejudiced in any way," and therefore, could not establish that Attorney Hoare had rendered ineffective assistance.  Petitioner timely appealed to this court.

On appeal, Petitioner asserts essentially the same argument she raised to the BIA:  her counsel was ineffective for failing to demonstrate that she was entitled to special rule suspension of deportation.  She furthers this argument by showing that she is entitled to special rule cancellation of removal and, by the very fact that she was ordered removed from the United States against her wishes, that she was prejudiced by her attorney's deficient performance.[3]  We agree.

---

[3]The BIA suggested, without stating explicitly, that Attorney Hoare's performance may not have been substandard.  Even an "attorney friendly" reading of the record, however, refutes this suggestion.  In fact, irrespective of any other deficient conduct, Attorney Hoare's mishandling of the supporting documents, by itself, demonstrates deficient performance: he failed to counsel Petitioner on the documents she needed, he failed to submit the documents he actually had, he submitted some too late to be admitted and offered no excuse, he failed even to offer an explanation to the court for Petitioner's repeated insistence that she had provided him with the documents, he could not produce anything from his file at the court's request, and he could not locate the most rudimentary case information in his file. The absence of these documents was central to the hearing, to Judge Hacker's assessment of the evidence, and eventually, to the decision on Petitioner's motions.  Yet, Attorney Hoare never submitted these documents, even after the importance of this issue was made evident.  It was not until Petitioner obtained new counsel that these documents were submitted.

9

Under NACARA, the "special rule" suspension-of-deportation or cancellation-of-removal provisions were made available to only a limited class of aliens. But the class includes:

> An alien who entered the United States on or before December 31, 1990, filed an application for asylum on or before December 31, 1991, and, at the time of filing the application, was a national of . . . Yugoslavia, or any state of the former Yugoslavia;

> An alien who is the spouse or child of an individual described [above] at the time a decision is made to suspend the deportation, or cancel the removal, of the individual described [above.]

8 C.F.R. § 1240.61(a)(3) & (4). In applying this provision, the BIA asserted that there was no record evidence that Petitioner (actually Petitioner's husband) had filed the requisite application for asylum by the December 31, 1991, deadline. But the BIA also conceded, albeit implicitly, that there was correspondingly no evidence that she had not filed, acknowledging that "[t]he record reflects that an asylum application was filed *at some point* [prior to December 20, 1994,] as [Petitioner] was granted advance parole as an asylum applicant or derivative asylum applicant" (emphasis added).

But, contrary to the BIA's assertion, there *was* record evidence that Mr. Deljosevic had applied for asylum prior to December 31, 1991. Specifically, the DHS stipulated in open court during the January 5, 2004, hearing, that Mr. Deljosevic had filed the application for asylum in 1990. This date is consistent with the signature date on the submitted copies (April 10, 1990) and, as Attorney Weideman pointed out in the "Motion to Reopen," the DHS had access to the filed copies. This stipulation by the DHS — particularly without any contradictory or inconsistent evidence, and with only supporting and consistent evidence — is sufficient to satisfy § 1240.61(a)(3). The other elements are not in dispute and the record compels a result different from that reached by the BIA.

On appeal, the DHS insists that, regardless of § 1240.61(a)(3) & (4), "the only relief for which [Petitioner] could be eligible to apply[,] if she established the filing of an asylum application

by December 31, 1991[,] is special rule cancellation of removal [under 8 C.F.R. § 1240.66], not suspension of deportation [under 8 C.F.R. § 1240.65], because she was [already] in removal proceedings." The DHS cites no authority for this generalized proposition, and we find none.[4] But, as the DHS suggests, Petitioner can proceed under "special rule cancellation of removal":

> To establish eligibility for special rule cancellation of removal . . ., the alien must establish that:
>
> (1) The alien is not inadmissible . . . or deportable . . . [due to] criminal activity, document fraud, failure to register, [or] security threats[];
>
> (2) The alien has been physically present in the United States for a continuous period of 7 years immediately preceding the date the application was filed;
>
> (3) The alien has been a person of good moral character during the required period of continuous physical presence; and
>
> (4) The alien's removal from the United States would result in extreme hardship to the alien, or to the alien's spouse, parent or child who is a United States citizen or an alien lawfully admitted for permanent residence.

8 C.F.R. § 1240.66(b). Petitioner meets the first three elements, just as she did under 8 U.S.C. § 1229b(b)(1) when Immigration Judge Hacker analyzed her motion for cancellation of removal under that provision. The issue here, as it was with Judge Hacker's § 1229b(b)(1) analysis, is whether Petitioner can satisfy the fourth element, the "extreme hardship" factor.

In Judge Hacker's § 1229b(b)(1) analysis, she explained that she could only consider hardship "to the qualifying family members," not Petitioner herself, and concluded that the testimony, lacking supporting documentation, did not demonstrate "exceptional and extremely

---

[4]We recognize that aliens properly placed in removal proceedings after April 1, 1997, are generally ineligible for suspension of deportation, *see Ramirez-Zavala v. Ashcroft*, 336 F.3d 872, 874 (9th Cir. 2003), but note that Petitioner was originally placed in removal proceedings, albeit unjustifiedly, on January 11, 1996, pursuant to the Order to Show Cause. As this January 1996 initiation was the origin of most, if not all, of Petitioner's subsequent difficulties, we are reluctant to deny her what little benefit that may come of it just because this initial insertion into the removal process was ultimately found to be unjustified. Thus, to the extent that it matters — although it likely does not — we conclude that Petitioner was placed in removal proceedings in January 1996, thus prior to April 7, 1997.

unusual hardship" to qualifying family members, rather than Petitioner herself.  On appeal to the BIA, the BIA also found that "[t]he record supports the Immigration Judge's determination that [Petitioner] failed to demonstrate that a qualifying relative would suffer 'exceptional and extremely unusual hardship' as is required to support a grant of cancellation of removal."

The notable difference here is that § 1240.66(b)(4) requires proof of "extreme hardship *to the alien, or*" the alien's family, and the DHS has set forth specific factors relevant to a decision on "extreme hardship" under this provision.  *See* § 1240.64(c) (stating that "extreme hardship shall be determined as set forth in § 1240.58").  Specifically:

> Factors that may be considered in evaluating whether deportation would result in extreme hardship to the alien or to the alien's qualified relative include, but are not limited to, the following:
>
> (1) The age of the alien, both at the time of entry to the United States and at the time of application for suspension of deportation;
>
> (2) The age, number, and immigration status of the alien's children and their ability to speak the native language and to adjust to life in the country of return;
>
> (3) The health condition of the alien or the alien's children, spouse, or parents and the availability of any required medical treatment in the country to which the alien would be returned;
>
> (4) The alien's ability to obtain employment in the country to which the alien would be returned;
>
> (5) The length of residence in the United States;
>
> (6) The existence of other family members who are or will be legally residing in the United States;
>
> (7) The financial impact of the alien's departure;
>
> (8) The impact of a disruption of educational opportunities;
>
> (9) The psychological impact of the alien's deportation;
>
> (10) The current political and economic conditions in the country to which the alien would be returned;
>
> (11) Family and other ties to the country to which the alien would be returned;

(12) Contributions to and ties to a community in the United States, including the degree of integration into society;

(13) Immigration history, including authorized residence in the United States; and

(14) The availability of other means of adjusting to permanent resident status.

8 C.F.R. § 1240.58(b). Without expressing an opinion as to whether Petitioner can actually demonstrate "extreme hardship" under these factors, we must recognize that several of these factors are in her favor. More to the point, this is an entirely different analysis than that conducted by Judge Hacker and the BIA when they determined that Petitioner could not demonstrate hardship.

Based on the foregoing, we conclude that Petitioner's counsel was ineffective for failing to assert that Petitioner was entitled to special rule cancellation of deportation and failing to support that assertion with the necessary and readily available documentation, or by pointing to evidence in the record. Petitioner has supported her claim that Attorney Hoare rendered ineffective assistance under the requirements of *Lozada*, 19 I. & N. at 637, and has demonstrated prejudice through a showing that, under the proper standard, there is a reasonable likelihood that the outcome would have been different. As a result, we **REVERSE** the BIA's denial of Petitioner's motion to reopen and **REMAND** this matter to the BIA for further proceedings consistent with this opinion.